UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------
UNITED STATES


-against-

SHABANI KHAMISI JABU,

                         Defendant.

-----------------------------------------

                                        **MEMORANDUM AND ORDER**

                                        12-CR-454 (KAM)

**MATSUMOTO, United States District Judge:**

          On September 20, 2012, defendant Shabani Khamisi Jabu,

a native Swahili-speaker from Tanzania, moved to suppress

certain custodial post-arrest statements made by him, arguing

that he was never advised of his *Miranda* rights in a fashion

that he could fully understand because he does not speak

English.  (ECF No. 12, Notice of Motion dated 9/20/12.)  The

government opposed the motion, and a suppression hearing was

held on October 19, 2012 regarding the circumstances under which

Mr. Jabu made the challenged post-arrest statements to law

enforcement.  (Docket entry dated 10/19/12.)

          Additionally, in accordance with the court's order at

the October 19, 2012 suppression hearing, on October 22, 2012,

the government confirmed that a certain Homeland Security

"checklist" document, discussed in detail below, was discarded

by the government's witness, Special Agent Carlos Soto.  (ECF

No. 20, Gov't Ltr dated 10/22/12.)  The record for the
suppression hearing was deemed closed, given that defendant did
not request it to remain open, and the motion is ripe for
decision.

For the following reasons, after hearing the testimony
of Special Agent Carlos Soto, which the court finds to be
credible in all respects, and reviewing the parties' respective
submissions and exhibits admitted into evidence at the
suppression hearing, the court finds that Mr. Jabu knowingly,
intelligently, and voluntarily waived his *Miranda* rights.  The
challenged post-arrest statements are thus admissible and Mr.
Jabu's motion to suppress is denied.

## BACKGROUND FACTS[1]

Although the testimony at the suppression hearing did
not address the events precipitating Mr. Jabu's arrest at JFK
Airport, the court heard from Special Agent Carlos Soto ("Agent
Soto") from the Department of Homeland Security, Homeland
Security Investigations.  (Tr. at 4-5.)  Agent Soto testified
under oath that at approximately 5:30 p.m. on June 17, 2012, he
was alerted by Customs and Border Protection ("CBP") Officer
Massimo to Mr. Jabu's presence in a holding area of Terminal One
of JFK Airport.  (*Id*. at 6-7, 25-26, 64.)  Mr. Jabu had been

---

[1] The facts set forth in this opinion are taken from the transcript ("Tr.") of
the October 19, 2012 suppression hearing.

arrested by CBP Officers on June 17, 2012 at JFK airport after a
flight arriving from Paris, France.  (*Id*. at 6-8.)

Agent Soto testified that he was lead case agent
responsible for conducting the interview of Mr. Jabu.  (*Id*. at
9.)  He testified that he and his partner, Special Agent John
LaBatt (together, the "HSI Agents"), arrived at the area in
which Mr. Jabu was detained, which was Terminal One of JFK
airport, at approximately 5:50 p.m. on June 17, 2012.  (*Id*. at
9, 26.)

Upon arrival, Agent Soto first spoke to CBP Officer
Massimo and asked if Mr. Jabu spoke English, and Officer Massimo
responded "yes."  (*Id*. at 7-8, 64.)  Agent Soto testified that
he asked this question to ascertain if an interpreter was
required in order to interview Mr. Jabu, in accordance with HSI
Department standard practices.  (*Id*. at 8-10.)  Agent Soto also
testified to the methods he would have used to secure an
interpreter's services had he believed one was necessary, and
the fact that Agent Soto had previously used interpreters to
interview non-English speaking individuals.  (*Id*. at 10, 50-51.)
Agent Soto himself speaks English and a little Spanish.  (*Id*. at
22.)

Agent Soto then testified that at approximately 6:00
p.m., he and Agent LaBatt entered the holding area to meet Mr.

Jabu.  (*Id*. at 9, 26.)  According to Agent Soto, Mr. Jabu was

alone in the holding area, seated and handcuffed to a bench on

which he sat.  (*Id*. at 9, 26-27.)  The parties do not dispute

that Mr. Jabu was in custody at this point.  Agent Soto

testified that he first asked Mr. Jabu if he spoke English, and

Mr. Jabu responded "yes," in English.  (*Id*. at 9-10.)  Agent

Soto then introduced himself and Agent LaBatt to Mr. Jabu.  (*Id*.

at 10-11.)

Agent Soto testified that he then commenced reading

Mr. Jabu his *Miranda* rights, in English, from a card supplied by

the Department of Homeland Security.  (*Id*. at 11-13.)  Although

Agent Soto had misplaced the original *Miranda* warnings card he

used with Mr. Jabu by the time of the suppression hearing, he

testified that Government Exhibit 4 was an accurate copy of the

original warnings and Government Exhibit 4 was admitted into

evidence.  (*Id*.)

According to Agent Soto, whom the court found entirely

credible, Agent Soto believed that Mr. Jabu understood his

*Miranda* rights and waived them knowingly and voluntarily.  (*Id*.

at 16.)  Agent Soto testified that at the start of the interview

when the *Miranda* warnings were first being read, Mr. Jabu asked

Agent Soto in English to slow down his speech, and Agent Soto

did so.  (*Id*. at 19, 50.)  Agent Soto further testified that in

response to being asked whether he understood the *Miranda*

warnings that Agent Soto had just read to him in English, Mr.

Jabu nodded his head in an up-and-down manner, which Agent Soto

understood to be an affirmative response.  (*Id*. at 14-15.)

Additionally, when next asked whether he was willing to waive

his rights and speak with Agent Soto outside the presence of an

attorney, Mr. Jabu answered "yes," in English.  (*Id*. at 14, 16.)

Based on these responses and Mr. Jabu's generally alert,

responsive demeanor, Agent Soto believed that Mr. Jabu

understood the *Miranda* warnings and related questions.  (*Id*. at

16-17, 19-20.)  Agent Soto further testified that Mr. Jabu did

not ask for the *Miranda* warnings to be repeated and that Mr.

Jabu did not ask any other questions or otherwise indicate that

he did not understand what was being said to him.  (*Id*. at 17,

19.)  After the warnings, Mr. Jabu was seated quietly and

remained compliant with Agent Soto.  (*Id*. at 17-18.)

 Agent Soto additionally testified that, pursuant to

the training he received from the Department of Homeland

Security, the interviewing agent has discretion whether to have

a defendant sign a written *Miranda* waiver form.  (*Id*. at 18, 39—

40.)  Agent Soto stated that he did not ask Mr. Jabu to sign a

*Miranda* waiver form because Agent Soto did not have such a

waiver form available at the time of Mr. Jabu's interview and

because it is not Agent Soto's practice to use the waiver form for every interview. (*Id.* at 18.) Agent Soto also stated that has begun to carry the waiver form in the last few months, which he produced during the hearing and was admitted as Defense Exhibit A. (*Id.* at 36-39.)

According to Agent Soto, after Mr. Jabu appeared to indicate his knowing waiver of his *Miranda* rights, Agents Soto and LaBatt spent approximately 15-20 minutes interviewing Mr. Jabu in English. (*Id.* at 18, 31.) Some of the questions Agent Soto asked of Mr. Jabu could be answered with a "yes" or "no" response, but others were open-ended, in the sense that they required substantive explanations or responses. (*Id.* at 18-19.) Agent Soto testified that Mr. Jabu appeared to fully understand the questions posed to him and that the answers Mr. Jabu gave in English were both relevant and responsive, further indicating to Agent Soto that Mr. Jabu understood the English-language questions being asked of him. (*Id.* at 18-20.)

Agent Soto also testified that never once during their interactions did Mr. Jabu give a response that was unresponsive to Agent Soto's questions or that otherwise indicated a lack of understanding of the English questions. (*Id.* at 17-20.) To the contrary, Agent Soto stated that at some point during the interview, Mr. Jabu asked Agent Soto, in English, how long Agent

6

Soto thought Mr. Jabu would be in jail due to the instant offense. (*Id*. at 20.) Mr. Jabu also volunteered to participate in a controlled delivery scenario with Agent Soto and other law enforcement at the hotel which had been Mr. Jabu's destination prior to being detained. (*Id*.) Again, this request was made and initiated by Mr. Jabu in English. (*Id*.) According to Agent Soto, at no point during this interview did Mr. Jabu request the assistance of an interpreter. (*Id*. at 21, 45.) Moreover, Agent Soto testified that he never believed or had reason to believe that Mr. Jabu needed an interpreter during the interview. (*Id*. at 45-48.)

After the interview was completed, Agent Soto escorted Mr. Jabu to Terminal Four of JFK airport for processing, which took about four hours. (*Id*. at 32-33.) During this time, Mr. Jabu told Agent Soto that he was cold and asked Agent Soto if he could have a sheet-like item or a jacket from his bag to keep himself warm. (*Id*. at 21.) According to Agent Soto, this conversation was initiated by Mr. Jabu and was conducted in English. (*Id*.)

After processing Mr. Jabu at Terminal Four, Agent Soto testified that he prepared to escort Mr. Jabu to the Metropolitan Detention Center in Brooklyn. (*Id*. at 31.) In the course of this preparation, Agent Soto compiled certain

7

documents regarding Mr. Jabu's arrest for distribution to the
court's Pretrial Services department and to the Assistant United
States Attorney on duty who would receive the case.  (*Id*. at 57-
58.)  Agent Soto used an internal Homeland Security "checklist"
to help him compile the necessary documents to be sent and to
ensure that all required documents were included. (*Id*. at 57-
60.)  The "checklist" itself, however, was not sent and was
discarded shortly after Agent Soto completed sending the
required paperwork for processing.  (*Id*.)  Agent Soto further
testified that the information on the checklist (as
distinguished from the information contained in the documents
actually transmitted) is generally conveyed verbally to the AUSA
on duty over the phone, not in written form.  (*Id*. at 59-62.)

Agent Soto testified that one of the boxes on the
checklist asks the agent to indicate whether the defendant
speaks languages other than English, and whether an interpreter
is needed for the defendant to appear in court for arraignment.
(*Id*. at 48, 58-59.)  When Agent Soto reached this box on the
checklist, he asked CBP Officer Massimo whether Mr. Jabu spoke
languages other than English.  (*Id*. at 59.)  Agent Soto
testified that CBP Officer Massimo responded that Mr. Jabu also
spoke Swahili.  (*Id*.)  In response to CBP Officer Massimo's
statement, Agent Soto checked "yes," "with interpreter," and

wrote in "Swahili" as the non-English language spoken by Mr. Jabu. (*Id*. at 34, 59.) According to Agent Soto, this was the first time he learned that Mr. Jabu spoke Swahili in particular, although Agent Soto had already recognized that English was not Mr. Jabu's native tongue. (*Id*. at 21-22, 30-31, 34.)

Agent Soto also testified that Mr. Jabu spoke English during their interactions in an effective, functioning manner. (*Id*. 30-31.) Agent Soto understood everything Mr. Jabu said to him in English, except for one instance when Mr. Jabu was attempting to pronounce the word "bird" and Agent Soto had Mr. Jabu repeat the word few times in order for Agent Soto to understand. (*Id*. at 31, 41.) Aside from the one time Mr. Jabu asked Agent Soto to slow down his speech, discussed earlier, Agent Soto did not recall another time when Mr. Jabu asked Agent Soto to repeat himself or when Mr. Jabu indicated that he could not understand what Agent Soto was saying to him in English. (*Id*. at 40-41, 47.) Agent Soto also testified that Mr. Jabu never told him that he wanted an interpreter and that Agent Soto never perceived or had reason to perceive that an interpreter was needed for their interactions. (*Id*. at 21, 45-48.) Agent Soto also testified that he never told Mr. Jabu that a Swahili interpreter was unavailable. (*Id*. at 21.)

9

In addition to the testimony of Agent Soto, the government presented at the hearing several email exchanges between Mr. Jabu and a party who appears to hold herself out as his wife, sent while Mr. Jabu has been in custody at the Metropolitan Detention Center, which were admitted as Government's Exhibit 2. (*Id*. at 71-72, 74-75.) As the government noted in its closing argument, in several of these emails Mr. Jabu's putative wife emailed him entirely or almost entirely in English. (*Id*. at 80-81.) In other emails, she emailed Mr. Jabu in a mix of Swahili and English. (*Id*.) Mr. Jabu's response to the emails written to him in English or mostly in English was usually in Swahili, but on occasion he responded with a short English message or a Swahili message that also included some English words or phrases. (*Id*.) The government stressed that these emails, combined with the series of conversations Mr. Jabu had with Agent Soto entirely in English, demonstrate that Mr. Jabu has, at the very least, a reasonably good command of the English language sufficient to establish that he waived his *Miranda* rights knowingly and voluntarily prior to making the challenged post-arrest statements. (*Id*. at 79-81.)

By contrast, Mr. Jabu argued in his motion papers that, prior to being questioned by the HSI Agents, he stated

10

that he did not fully understand English and requested an
interpreter to translate English into Swahili, but was told no
translator was available. (ECF No. 12-2, Defendant Shabani
Jabu's Affidavit in Support of Request for Pretrial Evidentiary
Hearing ("Jabu Aff."), ¶¶ 4, 6.) He also avers that he did not
fully understand what the Agents were saying to him in English.
(Jabu Aff. ¶ 5.) Additionally, Mr. Jabu avers that he was never
given a form to sign indicating his right to have an attorney
present while being questioned by law enforcement. (*Id*. ¶ 6.)
Mr. Jabu's attorney further noted during his closing argument
that since Mr. Jabu's encounter with the HSI Agents on June 17,
2012, Mr. Jabu has used the assistance of a Swahili-speaking
translator for all court appearances and meeting with Pretrial
Services. (Tr. at 83-84.)

## LEGAL STANDARDS

In order to introduce a defendant's custodial
statements at trial, the government must show by a preponderance
of the evidence that the defendant knowingly, intelligently and
voluntarily waived his *Miranda* rights against self-
incrimination. *United States v. Diallo*, 206 F. App'x 65, 66 (2d
Cir. 2006) (citing *Colorado v. Connelly*, 479 U.S. 157, 168
(1986)). Courts look to the totality of the circumstances in
assessing the voluntariness of the waiver. *United States v.*

*Noorzai*, 422 F. App'x 54, 55 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 526, (2011). In applying the totality of the circumstances test, courts should consider: "'(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.'" *Id*. (quoting *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988)). Moreover, a district court has discretion to determine a witness's credibility regarding the circumstances of a defendant's purported waiver of his *Miranda* rights. *Diallo*, 206 F. App'x at 65 (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 435 (2d Cir. 2001)).

With respect to the characteristics of the accused, it is well-settled in the Second Circuit that the existence of limitations on English language skills does not preclude a defendant from knowingly and voluntarily waiving his or her *Miranda* rights. *See, e.g., United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (defendant gave knowing and voluntary waiver where he had "a reasonably good command of the English language"); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding waiver where evidence showed defendant could speak in broken English, with lapses in native language, and he was alert and observant when warnings were given and indicated that he understood his rights); *United States v. Richardson*, No.

09-cr-874, 2010 WL 5437206, at *3-5 (E.D.N.Y. Dec. 23, 2010)
(finding defendant's waiver to be sufficient where defendant
responded to pretrial services' questions in English and
provided detailed, relevant answers in response); *United States
v. Ghafoor*, 897 F. Supp. 90, 91 (S.D.N.Y. 1995) (waiver was
valid where, *inter alia*, defendant indicated he spoke English,
claimed to understand his *Miranda* rights, responded to requests
for pedigree information, made a specific statement regarding
the offense, and never asked the law enforcement officer to
repeat questions); *United States v. Yian*, No. 94-cr-719, 1995 WL
422019, at *2-4 (S.D.N.Y. July 18, 1995) (defendant's English
was sufficient to make a knowing waiver where did not indicate a
lack of understanding and was able to converse with English-only
speakers); *United States v. Li*, No. 95-cr-0226, 1995 WL 390094,
at *4 (S.D.N.Y. July 3, 1995) (finding that defendant's English
skills were sufficient where defendant did not indicate that he
did not understand the warnings, exhibited no difficulty in
understanding what officers speaking only English were saying,
and was able to discuss various scenarios under which a visit to
the defendant's home would proceed).

## DISCUSSION

As previously noted, the court finds credible Agent
Soto's testimony regarding the circumstances of Mr. Jabu's

13

waiver of his *Miranda* rights.  Thus, as set forth below, the

totality of circumstances in this case demonstrates that Mr.

Jabu's waiver of his *Miranda* rights was knowing, intelligent,

and voluntary.  Although Mr. Jabu claims that his limited

command of the English language prevented him from fully

understanding his waiver of rights when he was interviewed by

Agent Soto, the preponderance of evidence indicates otherwise.

*See Diallo*, 206 F. App'x at 66.

As the credible testimony of Agent Soto established,

Mr. Jabu appeared to understand the *Miranda* rights read to him

in English by Agent Soto.  (Tr. at 16.)  After first asking

Agent Soto in English to slow down his speech, Mr. Jabu listened

attentively and alertly to the warnings.  (*Id*. at 19-20, 50.)

When asked if he understood those rights, he nodded his head in

a manner indicating affirmation.  (*Id*. at 14-15.)  When next

asked if he was still willing to speak with Agent Soto outside

the presence of an attorney, Mr. Jabu verbally answered "yes,"

in English.  (*Id*. at 14, 16.)  Thus, where, as here, a defendant

does not indicate that he does not understand the *Miranda*

warnings read to him in English and also exhibits no difficulty

in understanding what officers speaking only English are saying,

courts in this Circuit have found valid waivers despite the

presence of some English-language limitations.  *See, e.g.,*

*Campaneria,* 891 F.2d at 1020 (finding waiver where defendant could speak in broken English, with lapses in native language, and he was alert and observant when warnings were given and indicated that he understood his rights); *Ghafoor*, 897 F. Supp. at 91 (waiver was valid where, *inter alia*, defendant indicated he spoke English, claimed to understand his *Miranda* rights, responded to requests for pedigree information, made a specific statement regarding the offense, and never asked the law enforcement officer to repeat questions).

Additionally, after indicating his waiver of his *Miranda* rights, Mr. Jabu actively participated in a 20-minute interview with Agent Soto conducted entirely in English, and gave relevant responsive answers in English. (*See* Tr. at 16-28.) Mr. Jabu's answers and comments to Agent Soto in English went far beyond a simple "yes" or "no" (*id*. at 18-19); for instance, he asked Agent Soto in English how long he would be incarcerated for and also volunteered, in English, to participate in a controlled delivery to assist law enforcement (*id*. at 20). Courts have readily found, where, as here, that a defendant's ability to communicate in English with English-only speakers weighs towards a finding of valid waiver. *See, e.g.*, *Richardson*, 2010 WL 5437206, at *3-5 (waiver sufficient where defendant responded to pretrial services' questions in English

and provided detailed, relevant answers in response); *Yian*, 1995
WL 422019, at *2-4 (defendant's English was sufficient to
provide a knowing waiver of *Miranda* rights where defendant did
not indicate a lack of understanding and was able to converse
with English-only speakers); *Li,* 1995 WL 390094, at *4
(defendant's English skills were sufficient to support finding
valid waiver where defendant did not indicate that he did not
understand the warnings, exhibited no difficulty in
understanding what officers speaking only English were saying,
and was able to discuss various scenarios under which a visit to
the defendant's home would proceed).

Moreover, despite Mr. Jabu's Affidavit to the contrary
(Jabu Aff. ¶¶ 4-6), the court found credible Agent Soto's sworn
testimony that Mr. Jabu never indicated his lack of
understanding or requested an interpreter during the custodial
interview (Tr. at 17, 19-21, 40-41, 45-48). Likewise, the court
found credible Agent Soto's testimony that Mr. Jabu's actions
after the interview also did not suggest that an interpreter was
necessary. For example, Mr. Jabu asked Agent Soto, in English,
during processing if he could have a sheet or jacket from his
bag. (Tr. at 21.) Additionally, as demonstrated by the emails
sent to and from Mr. Jabu's email address while he has been at
the MDC, Mr. Jabu is able to respond to communications that are

16

entirely (or almost entirely) in English (id. at 80-81), which

courts have held weighs towards a finding of a valid waiver, *see*

*Yian*, 1995 WL 422019, at *2-4. Although Agent Soto indicated on

the Homeland Security checklist form that Mr. Jabu also spoke

Swahili and needed an interpreter for his initial court

appearance (Tr. at 34, 52, 59), this one countervailing fact

does not trump the overwhelming amount of evidence the

government presented at the suppression hearing establishing

that Mr. Jabu does indeed have a reasonably good command of

English. *See, e.g., Jaswal*, 47 F.3d at 542 (defendant gave

knowing and voluntary waiver where he had "a reasonably good

command of the English language"); *Campaneria,* 891 F.2d at 1020

(finding waiver where defendant could speak in broken English,

with lapses in native language, and he was alert and observant

when warnings were given and indicated that he understood his

rights).

Under these circumstances, in particular Mr. Jabu's

ability to participate (in English) in extensive and substantive

English-only interactions with Agent Soto, the court finds that

the preponderance of the evidence establishes that Mr. Jabu's

English-language skills were sufficient to enable him to

knowingly, voluntarily, and intelligently waive his *Miranda*

rights pursuant to this Circuit's controlling precedent. *See,*

*e.g., Jaswal*, 47 F.3d at 542; *Richardson*, 2010 WL 5437206, at

*3-5; *Yian*, 1995 WL 422019, at *2-4; *Li,* 1995 WL 390094, at *4.

Thus, Mr. Jabu's motion to suppress the challenged post-

custodial statements to Agent Soto is denied, and the statements

will be admitted at trial.

## CONCLUSION

For the reasons discussed above, the court finds that

defendant Shabani Khamisi Jabu knowingly and voluntarily waived

his *Miranda* rights, and, thus, his motion to suppress the post-

custodial statements made by him to law enforcement is denied.

**SO ORDERED.**

Dated:    November 5, 2012
          Brooklyn, New York


                              _____/s/_____    _____
                              **Kiyo A. Matsumoto**
                              United States District Judge